UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

COREY INFANTINO, on behalf of himself and
all others similarly situated,

                        Plaintiff,                          DECISION & ORDER and
                                                            REPORT & RECOMMENDATION

            v.                                              20-CV-6782W

SEALAND CONTRACTORS CORP., and
DANIEL BREE, individually,

                        Defendants.
_____


## INTRODUCTION

Plaintiff Corey Infantino ("plaintiff" or "Infantino") commenced this lawsuit on

October 1, 2020 as a putative collective action pursuant to the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 216(b), and as a putative class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure.  (Docket # 1).  In his complaint, Infantino alleges that defendants

Sealand Contractors Corp. ("Sealand") and Sealand's president, Daniel Bree ("Bree"),

improperly withheld overtime compensation in violation of the FLSA and the New York Labor

Law ("NYLL").  Antonio Hepburn ("Hepburn") filed a consent to become a party plaintiff on

October 26, 2020.  (*See* Docket # 4).  Following two extensions of the applicable deadline,

defendants answered the complaint on December 14, 2020.  (Docket ## 7, 9, 11).

On December 22, 2020, defendants advised plaintiffs that they would stipulate to

conditional certification of an FLSA collective action consisting of "non-managerial laborers

who worked for [d]efendants and were members of the Rochester Laborers Union 435 from

October 1, 2017 through October 1, 2020."  (Docket # 20-2 at ¶ 2 (Declaration of Justin R.

Marino, Esq., counsel for plaintiffs)).[1]  The parties agreed on December 29, 2020 to refine the scope of the collective to "all non-managerial laborers" who worked in New York.  (Docket # 20-2 at ¶ 3).  Plaintiffs represent, and defendants do not dispute, that on January 29, 2021, defendants rescinded their agreement.  (*Id.* at ¶ 5).

Less than a month later, on February 19, 2021, plaintiffs timely moved for conditional certification of this matter as an FLSA collective action pursuant to 29 U.S.C. § 216(b), for leave to distribute notice, and for equitable tolling of the statute of limitations based upon defendants' disavowal of their agreement as described in the preceding paragraph.  (Docket ## 16, 20).  Defendants have opposed plaintiffs' motion and have cross-moved to compel arbitration or, alternatively, to dismiss the complaint.  (*See* Docket # 33).  Plaintiffs have opposed defendants' cross-motion.  (*See* Docket # 37).

## THE COMPLAINT

Sealand, which is located in Rush, New York, is a highway and bridge contractor that performs demolition and construction work in New York, North Carolina, and Florida. (Docket ## 1 at ¶ 29; 11 at ¶ 29).  Bree is the President of Sealand.  (Docket # 33-2 at ¶ 1). Infantino allegedly worked as a "non-managerial laborer" for Sealand from July 2016 until September 8, 2019, during which time he performed construction and demolition tasks, such as guardrail removal and jackhammering, and earned $29.00 per hour, which equated to a statutory overtime rate of $43.50 for every hour worked over forty in a workweek.  (Docket # 1 at ¶¶ 30,

---

[1]  The facts relating to the parties' December 2020 negotiations and agreement and defendants' January 2021 renunciation of that agreement are taken from the declaration of Justin Marino, Esq., counsel for plaintiffs, submitted in support of the pending motion.  (*See* Docket # 20-2).  Although defendants have opposed the motion, they have not disputed the allegations about the agreement and its rescission; indeed, they have not addressed them at all.  (*See* Docket ## 33, 38).

31, 33).  Infantino asserts that he "routinely worked . . . between sixty and ninety-eight hours per workweek," and was never, or rarely, permitted "to take an uninterrupted meal break."  (*Id.* at ¶ 32).

The crux of Infantino's complaint is that defendants engaged in a "pervasive practice" of understating the hours that Infantino and similarly-situated non-managerial laborers worked and of failing to properly compensate him and the other laborers for overtime worked, in violation of federal and state law, as well as the terms and conditions of their employment, and "failed to provide [them] with a wage statement that accurately listed [their] actual hours worked" for a given week.  (*See id.* at ¶¶ 2-5, 15-17, 23, 33, 35, 36, 38).


## DISCUSSION

I.    **Plaintiffs' Motion for Conditional Certification of an FLSA Collective Action and Leave to Distribute Notice**

Plaintiffs seek conditional certification of an FLSA collective class consisting of "current and former non-managerial laborers employed by [Sealand and/or Bree], who performed work for [d]efendants in New York at any time between October 1, 2017 through the date the Court grants conditional certification and did not receive overtime compensation at a rate of time and one-half their regular rate of pay for all hours over forty that they worked in a workweek."  (Docket # 20-1 at 7; *see also id.* at 31).  Plaintiffs do not seek certification of this matter as a class action under Fed. R. Civ. P. 23 at this time.

A.    **Infantino's Declaration**

Infantino affirms that he worked for defendants on projects in Monroe County, New York, from July 2016 through September 8, 2019, during "some or all" of which he was a

member of a union.  (Docket # 20-4 at ¶ 2).[2]  Defendants paid Infantino $29.00 per hour for his

work with defendants, thus statutorily entitling him to $43.50 per hour for overtime, and

Infantino states that he "routinely worked for [d]efendants between sixty and ninety-eight total

hours per workweek."  (Docket # 20-4 at ¶¶ 5, 6).  Infantino also states that defendants "did not

maintain contemporaneous time records, such as a time clock or daily entry of [the laborers']

actual time."  (*Id.* at ¶ 7).  Rather, according to Infantino, defendants "had a practice and policy

of lumping the time worked by its non-managerial laborers, including [himself], in a generalized

manner," which caused "the time worked for each employee [to be] understated, [and] which

thereby resulted in [Infantino] and [his] coworkers failing to receive the full amount of overtime

that was due to [them]."  (*Id.*).

       In his declaration, Infantino recounts instances during work on a project on

Interstate 90 in which defendants "attempt[ed] to cover up their unlawful time-keeping and pay

practices by having all non-managerial laborers sign [non-contemporaneous] time records."  (*Id.*

at ¶ 8).  Infantino asserts that during this project defendants:

> often br[ought] a stack of time records purporting to represent the
> time worked for the [previous] several weeks (typically two to four
> weeks at a time), place[d] them on the hood of a truck, then ha[d]
> all the non-managerial laborers (including [Infantino]) line up, find
> [their] time sheets, and instruct [them] to sign off on them.

(*Id.*).  According to Infantino, these records, which the laborers were not given sufficient time to

verify, failed to accurately state their work hours and thus deprived them of "overtime pay for

many hours worked over forty on a weekly basis."  (*Id.*).

       Infantino also claims that he "worked with and observed as many as forty other

non-managerial laborers working on the same projects that [he] was assigned to work and

---

[2] According to the declaration submitted by defendant Bree in opposition to plaintiffs' motion, the dates of
Infantino's employment were August 29, 2016 through September 15, 2019.  (Docket # 33-2 at ¶ 12).

performing similar duties as [he] did" and that they were "subjected to the same unlawful time-keeping and pay practices/policies as [he] was subjected to." (*Id.* at ¶ 9). Infantino explains that his knowledge is based upon his personal observations and conversations with six named non-managerial coworkers – Jafari Lamont, Nick Lanna, Tom Chicinno, Mark Williams, Tim Reddy, and Jason Hart – who each spoke with Infantino about being "short[ed] on hours and not being paid for all hours they worked." (*Id.*).

In his declaration, Infantino states that he was "aware that [his] coworkers also worked well over forty hours per week because they either told [him] or [he] observed them working on the same job sites that [he] was working on." (*Id.* at ¶ 10). According to Infantino, he recalls that Lamont spoke to him several times about being shorted hours and pay. (*Id.* at ¶ 9(a)). Specifically, he affirms that when they were working on the "Scottsville Road job," Lamont came to him and discussed being shorted on hours on a particular job which Infantino understood to be either the 104 Flyover East job or the Wegman's Road Bridge job. (*Id.*). Infantino also recalls having "several conversations with Lanna about [d]efendants' unlawful time-keeping and pay practices," and Lanna specifically complaining about being shorted on hours while working on the 104 Flyover job. (*Id.* at ¶ 9(b)). According to Infantino, he and Chicinno spoke while working on a project on I-90, and Chicinno "was aware that he was shorted on hours" but accepted the undercounting because defendants provided him with transportation to and from the jobsite and because he was worried about finding other employment. (*Id.* at ¶ 9(c)). Infantino also had "several conversations with Mr. Williams about his hours worked and compensation paid being understated," and Williams "mentioned that this was a constant problem at Sealand." (*Id.* at ¶ 9(d)). Redding "advised [Infantino] that he would 'eat' his hours and was constantly shorted on his pay," but did not want to lose his job because

he needed work and had no driver's license to use to look for work. (*Id.* at ¶ 9(e)). Finally, Infantino recalls speaking twice to Hart when they worked together on a project on I-90, during which Hart "advised [Infantino] that he too was shorted on his hours and pay." (*Id.* at ¶ 9(f)).

### B.   Hepburn Declaration

Opt-in plaintiff Antonio Hepburn, who was not a union member, worked for defendant as a "non-managerial laborer" for one week from July 28, 2019 through August 3, 2019 on a ramp project connecting Route 104 to the Bay Bridge at the 590 interchange; he earned the same rate as Infantino. (Docket # 20-5 at ¶¶ 2, 4, 7). Hepburn affirms that during his brief employment with defendants performing construction and demolition tasks, he worked "five days" for an accumulated total of "between fifty and fifty-five total hours" and defendants failed to properly compensate him for all the overtime he worked. (*Id.* at ¶¶ 3, 5-6, 7).[3] Hepburn also claims that defendants "did not maintain contemporaneous time records" and that he never "sign[ed] off on any timesheets or was permitted to verify [his] hours worked." (Docket # 20-5 at ¶ 8). Instead, according to Hepburn, defendants "recorded [his] time in a generalized manner by lumping [his] time with the approximate time of [his] coworkers," resulting in an understatement of his time worked and underpayment of "the full amount of overtime that was due to [him]." (*Id.*).

In his declaration, Hepburn also affirms that during his one workweek he "worked with and observed many other non-managerial laborers . . . performing similar duties as [he] did." (*Id.* at ¶ 9). He "know[s]" these coworkers "were subjected to the same unlawful time-keeping and pay practices/policies because [he] spoke to Jafari Lamont about it" during the

---

[3]   In his declaration, Bree states that Hepburn worked for defendants for 4 days and was paid 32 hours regular time pay and 16 hours of overtime pay. (Docket # 33-2 at ¶ 11).

time that they worked on the project and after the project was completed.  (*Id.*).  According to

Hepburn, Lamont told him that he was "being shorted on hours and pay."  (*Id.*).

      **C.**     **Plaintiffs' Arguments In Support of Their Motion for Conditional
Certification, Notice Authorization and Equitable Tolling**

      Relying on Infantino's and Hepburn's declarations, as well as the allegations

contained in the complaint, plaintiffs maintain that they have met their burden for conditional

certification by demonstrating that a "factual nexus exists between [p]laintiffs' claims and those

of the putative opt-in plaintiffs."  (Docket # 20-1 at 21).  They contend that the specifically

detailed conversations between Infantino and his six coworkers, and the observations that he

describes, show that the proposed collective of non-managerial laborers is similarly situated to

plaintiffs insofar as they performed similar tasks and "were subjected to the same uniform

time-keeping and pay practice resulting in understating of overtime hours worked in violation of

the FLSA."  (*Id.* at 23).

      Plaintiffs further maintain that the Court should authorize notice of the lawsuit to

putative members of the collective class and specifically approve their proposed "Court

Authorized Notice of Lawsuit" (the "Notice").  (*Id.* at 25-28; Docket # 20-6 (proposed Notice)).

To assist with the distribution of notice, plaintiffs request that the Court order defendants to

produce a "computer-readable data file containing the names, last known mailing addresses, all

known home and mobile telephone numbers, all known email addresses, and dates of

employment for all potential collective action members who worked for [d]efendants in New

York at any point from October 1, 2017 to the present."  (Docket # 20-1 at 26).  Plaintiffs request

a sixty-day opt-in period and permission to provide reminder notices to potential opt-in plaintiffs

thirty days after mailing of the Notice.  (*Id.* at 27; *see also* Docket # 20-7 (proposed reminder

notice)).  Plaintiffs seek permission to send the Notice and the reminder notice via first-class

mail and email.  (Docket # 20-1 at 27-28; *see also* Docket # 20-8 (proposed email notice)).  In addition, plaintiffs request that defendants be directed to "post the [N]otice in a conspicuous place at project locations where non-managerial laborers congregate, such as where they customarily post legally-required minimum wage notice, and to provide proof of their compliance in the form of an affidavit that the posting will remain, unobstructed, continuously throughout the opt-in period."  (Docket # 20-1 at 28).

Finally, plaintiffs urge the Court to equitably toll the FLSA statute of limitations and permit opt-in plaintiffs to assert claims arising from a three-year period beginning three years prior to the date the complaint was filed.  (*Id.* at 28-30).  As justification for the equitable relief sought, plaintiffs rely on defendants' unexpected rescission in late January 2021 of their agreement to stipulate to conditional certification, which rendered fruitless their negotiations and required plaintiffs to file and litigate a motion for conditional certification that they had expected to avoid by the December agreement.  (*Id.*).

D.   **Defendants' Opposition**

In response to plaintiffs' conditional certification motion, defendants have cross-moved to compel arbitration or, in the alternative, to dismiss the complaint for failure to exhaust administrative remedies.  (Docket # 33).  For the reasons explained *infra* at Sections II and III, I find that the cross-motion lacks merit.  Accordingly, it is not a bar to consideration of plaintiffs' motion, which defendants have substantively opposed.  In opposition to plaintiffs' motion, defendants assert that Infantino has not offered sufficient evidence to establish a "factual nexus between his situation and those that he claims are similarly situated" but instead relies on "rank hearsay and vague innuendo" in support of plaintiffs' request for conditional certification.  (Docket # 33-1 at 15, 17).  Specifically, defendants contend that Infantino's declaration "does

8

not address how he has first-hand knowledge of Sealand's payroll policy, nor does he address how he knows if any such policy [of allegedly lumping the time worked by defendants' non-managerial laborers in a generalized matter] applied to laborers on other jobs [o]n which he was not working."  (*Id.* at 15-16).  In defendants' estimation, plaintiffs' motion is also deficient because it "fails to provide any testimony that other laborers failed to properly certify their timesheet[s]" or "were not paid for any overtime which they would be entitled to."  (*Id.* at 16). Defendants further dispute that they had a policy of depriving workers of overtime and maintain that contemporaneous time records for employees were kept on an iPad and verified by a union foreman.  (*Id.* at 17).  According to defendants, employees, including Infantino, "routinely confirmed the accuracy of those timesheets," and defendants adjusted paychecks when alerted to an error.  (*Id.* at 17, 19).

With respect to the proposed Notice, defendants assert in conclusory fashion that plaintiffs' collective definition and proposed Notice is inadequate.  (*Id.* at 19-20).  Specifically, defendants object to the lack of definition provided for the term "laborer" and contend that opt-in plaintiffs should be required to return consent forms to the Court Clerk's Office, rather than to plaintiffs' counsel.  (*Id.*).

In support of their opposition, defendants rely upon a declaration of defendant Bree affirmed on March 28, 2021.  (Docket # 33-2).  Bree states that Sealand "has no policy or procedure that provides for the denial of overtime pay."  (*Id.* at ¶ 3).  He affirms that Hepburn worked for four days and was paid for 32 hours regular pay and 16 hours overtime, as reflected in a pay stub appended to Bree's declaration.  (*Id.* at ¶ 11; *see also* Docket # 33-6).  He further affirms that Infantino worked for Sealand from August 2016 through mid-September 2019 and was compensated at an overtime rate for 466.50 hours of the total 3,387 hours that he worked

during that period.  (Docket # 33-2 at ¶¶ 12-13).  According to Bree, Infantino certified 80% of the total hours he worked at Sealand, occasionally alerted Sealand's payroll department that he believed his paycheck was incorrect, and six times received a resulting adjustment to his pay. (*Id.* at ¶¶ 14-15).  Bree explains that Sealand performed contractual public projects work, known as "prevailing wage jobs"; one such project, on which Infantino claimed he worked 60 hours, limited the hours laborers could work by virtue of lane closures, and Bree states that "Infantino could not have worked 60 hours because Sealand was not allowed to work that many hours." (*Id.* at ¶¶ 4, 16-18).  Finally, Bree affirms that "Sealand's foremen each have an iPad on which the number of hours that each individual works are tracked."  (*Id.* at ¶ 10).

    **E.**    <u>**Analysis**</u>

        The FLSA provides that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  The FLSA creates a private right of action against employers who violate the overtime compensation requirements, and affected employees may bring suit on behalf of themselves and other similarly situated employees.  *Bonett v. Shawmut Woodworking & Supply, Inc.*, 2021 WL 423181, *2 (W.D.N.Y. 2021); *Shibetti v. Z Rest., Diner & Lounge, Inc.*, 478 F. Supp. 3d 403, 413 (E.D.N.Y. 2020).

        "Unlike a representative action under Rule 23 of the Federal Rules of Civil Procedure, where all persons in the defined class are bound by the case outcomes unless they affirmatively 'opt out,' an employee does not become a party to an FLSA collective action unless he or she affirmatively 'opts in' by filing written consent with the court."  *Gordon v. Kaleida Health*, 2009 WL 3334784, *3 (W.D.N.Y. 2009).  Unlike motions for class certification under

Fed. R. Civ. P. 23, "motions for preliminary certification of FLSA collective actions are more easily supported, and are designed to be made prior to discovery." *Hart v. Crab Addison, Inc.*, 2015 WL 365785, *2 (W.D.N.Y. 2015). District courts have discretion to facilitate notice to potential plaintiffs of the pendency of an FLSA lawsuit in order to enable them to decide whether to opt-in as party plaintiffs. *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989); *see also Shibetti v. Z. Rest., Diner & Lounge, Inc.*, 478 F. Supp. 3d at 414 ("[t]he sole consequence of conditional certification is the sending of court-approved written notice to employees, who in turn become parties to a collective action only by filing written consent with the court") (quotation omitted).

Courts within this Circuit utilize a two-step approach when determining whether a case should proceed as an FLSA collective action. *See, e.g., Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010), *cert. denied*, 565 U.S. 930 (2011); *Bonett v. Shawmut Woodworking & Supply, Inc.*, 2021 WL 423181 at *2-3; *Hart v. Crab Addison, Inc.*, 2015 WL 365785 at *2. At the first step, known as "conditional[] certifi[cation]," the court reviews the pleadings, as well as any affidavits or declarations, and determines whether the proposed class members are similarly situated. *Barrus v. Dick's Sporting Goods, Inc.*, 465 F. Supp. 2d 224, 229 (W.D.N.Y. 2006) (citation omitted); *see also Shibetti*, 478 F. Supp. 3d at 414 (on motions for conditional certification, "the focus of the inquiry is not on whether there has been an actual violation of law but rather on whether the proposed plaintiffs are similarly situated under 29 U.S.C. § 216(b) with respect to their allegations that the law has been violated") (alteration and citation omitted). The law is well-settled that:

> [t]he evidentiary standard is lenient at this stage, the plaintiffs need make only a modest factual showing that they and the other putative collective action members together were victims of a common policy or plan that violated the law[;] [a] plaintiff's

> burden on this step is minimal, especially since the determination
> that potential plaintiffs are similarly situated is merely a
> preliminary one.

*Hart*, 2015 WL 365785 at *2 (quoting *Gordon v. Kaleida Health*, 2009 WL 3334784 at *3-4).

In other words, "[t]o establish that the potential class members are similarly situated, the

plaintiffs must demonstrate a 'factual nexus' between the circumstances giving rise to their

claims and the circumstances of those individuals whom plaintiffs seek to notify about th[e]

action." *Sherrill v. Sutherland Global Servs., Inc.*, 487 F. Supp. 2d 344, 349 (W.D.N.Y. 2007).

At this first, conditional certification, stage, the "court does not resolve factual disputes, decide

substantive issues going to the ultimate merits, or make credibility determinations, and

accordingly, an FLSA collective action may be conditionally certified upon even a single

plaintiff's affidavit." *Robbins v. Blazin Wings, Inc.*, 2016 WL 1068201, *6 (W.D.N.Y. 2016)

(alteration and quotation omitted).

  The second step occurs after discovery is largely complete, and the court makes a

factual finding on a fuller, more-developed record whether the collective action may proceed by

determining whether the opt-in plaintiffs are in fact similarly situated to the named plaintiffs.

*Myers v. Hertz Corp.*, 624 F.3d at 555.  *See also Hart*, 2015 WL 365785 at *2; *Barrus v. Dick's

Sporting Goods, Inc.*, 465 F. Supp. 2d at 229.  If the court determines that they are not similarly

situated, the action may be de-certified and the opt-in plaintiffs' claims dismissed without

prejudice.  *Myers*, 624 F.3d at 555.

  Thus, the burden at the pre-discovery conditional certification stage is hardly

onerous, and although it "cannot be satisfied simply by unsupported assertions, . . . it should

remain a low standard of proof because the purpose of this first stage is merely to determine

whether similarly situated plaintiffs do in fact exist." *Hart*, 2015 WL 365785 at *3 (quoting

*Myers*, 624 F.3d at 555).  "Because the standard at the first stage is fairly lenient, courts applying it typically grant conditional certification," *Chhab v. Darden Rests., Inc.*, 2013 WL 5308004, *9 (S.D.N.Y. 2013) (quotation omitted), although conditional certification is not "automatic," *Mata v. Foodbridge LLC*, 2015 WL 3457293, *2 (S.D.N.Y. 2015) (citation omitted).

        In evaluating the sufficiency of plaintiffs' showing in the case at bar, it bears repeating that a court may grant conditional certification on the basis of allegations in a complaint and a plaintiff's declaration.  *See Miranda v. Gen. Auto Body Works, Inc.*, 2017 WL 4712218, *2 (E.D.N.Y. 2017) ("[w]hile it is true that mere allegations are not enough to justify conditional certification[,] . . . there are numerous examples of courts in th[e] [Second] Circuit granting conditional certification based on the pleadings and single affidavit by the plaintiff") (collecting cases).  Although defendants assail plaintiffs' declarations as consisting of "rank hearsay and vague innuendo" (Docket # 33-1 at 17), a court may consider hearsay allegations at this stage of the proceedings in assessing the sufficiency of plaintiffs' showing.  *See, e.g.*, *Panora v. Deenora Corp.*, 2020 WL 7246439, *2 (E.D.N.Y. 2020) ("[c]ourts in th[e] [Second] Circuit have routinely found that a modest factual showing can be established 'based solely on the personal observations of one plaintiff's affidavit' . . . and have held that hearsay may be relied upon to support conditional certification") (citations omitted); *see also Shibetti*, 478 F. Supp. 3d at 414 ("there are many cases that recognize that a plaintiff need make only a 'modest showing' of a similar situation between the plaintiff and the other members of the proposed collective[;] . . . [t]his includes allowance of hearsay statements from other employees in the plaintiff's affidavit") (citations omitted); *Salomon v. Adderley Indus., Inc.*, 847 F. Supp. 2d 561, 565 (S.D.N.Y. 2012) (rejecting argument that the court should not credit plaintiffs' hearsay statements about other employees' lack of overtime pay; "[c]ourts in th[e] [Second] Circuit

regularly rely on hearsay evidence to determine the propriety of sending a collective action
notice[;] . . . [g]iven that [d]efendants will have an opportunity to move for decertification at the
second stage if the plaintiffs are not 'similarly situated,' and the prediscovery posture of the case,
the [c]ourt will consider the hearsay statements here") (alteration and citations omitted); *Zivali v.
AT&T Mobility LLC*, 646 F. Supp. 2d 658, 662 (S.D.N.Y. 2009) ("[d]efendants' argument that
plaintiffs' declarations are comprised of idiosyncratic, unrepresentative, and conclusory
allegations based on impermissible hearsay is of no moment[;] . . . the standard governing the
factual basis for certification at this early stage is relatively permissive since the motion comes
before discovery has commenced in earnest").  Of course, the court must carefully evaluate the
particular allegations proffered to establish the necessary "factual nexus" in order to ensure that
they are not too conclusory to be credited.  *See*, *e.g.*, *Chui v. Am. Yuexianggui of LI, LLC*, 2020
WL 3618892, *7 (E.D.N.Y. 2020) ("[t]he factual nexus between [p]laintiff's situation and that of
the putative collective is the heart of the [c]ourt's analysis when determining whether to
conditionally certify a collective action").

        Where, as here, "plaintiffs base their assertions regarding similarly situated
employees upon their own observations and conversations with other employees, courts have
required details about these observations and conversations, such as where and when they
occurred and the names of the employees involved."  *Id.* (plaintiff "provide[d] the requisite
factual detail regarding her conversations in support of conditional certification, including the
first names of the waitresses and sushi chef and the general time and location of the
conversations [p]laintiff had with them[;] . . . [b]ased on these conversations, [p]laintiff learned
that the waitresses and sushi chef also worked over 40 hours per week, received either a fixed
salary or a salary within a fixed range irrespective of the tips received or hours worked, and were

14

not paid overtime wages[;] . . . [t]he [c]ourt finds that these factual allegations are sufficient to establish a factual nexus between [p]laintiff's situation and that of the waitress/waiters and sushi chefs such that they are similarly situated 'victims of a common policy or plan that violated the law'") (collecting cases) (citations omitted); *see also*, *e.g.*, *Shibetti*, 478 F. Supp. 3d at 415 ("there is a crucial difference between a plaintiff averring that 'I have spoken to other employees and they tell me they are treated the same,' as opposed to, 'I have spoken to [e.g.] Jane Alexander, Joan Smith, and each of them has also told me that they received no tip credit and worked an unpaid training period'[;] [at the conditional certification stage,] [t]he former . . . is not adequate, but the latter probably is"); *Miranda v. Gen. Auto Body Works, Inc.*, 2017 WL 4712218 at *1-2 ("[plaintiff] has submitted a declaration in which he alleges that during his five years of employment as an auto body worker and mechanic, the [d]efendants regularly failed to pay him for overtime hours[;] . . . [i]n this declaration, [plaintiff] also claims that [d]efendants do not accurately track employees' work hours, and intentionally omitted overtime hours from his paystub[;] . . . [plaintiff] also [names] two other auto body workers and mechanics . . . who claim that [d]efendants failed to pay them overtime compensation for hours worked over 40 hours[;] . . . [h]ere, [plaintiff's] claims based on personal observation and conversations with a small collective of co-workers who share the same duties and responsibilities[] is enough to show a 'factual nexus' supporting a 'common discriminatory scheme'") (citations omitted).  *Cf. Bonett*, 2021 WL 423181 at *4 (declining conditional certification where "[p]laintiff's affidavit provide[d] no details as to when and how he conversed with his coworkers about defendant's contested policies, or otherwise learned of the[] violations[;] [h]is declaration sp[oke] in the most general terms about observing tasks assigned to other [a]ssistants[;] [p]laintiff's statement to the effect that he knew that others were affected by a similar policy 'through regularly

15

communicating' with other [a]ssistants provide[d] no concrete facts about these conversations and d[id] not name a single coworker with whom he communicated"); *Reyes v. Nidaja, LLC*, 2015 WL 4622587, *2-3 (S.D.N.Y. 2015) ("[m]otions for conditional certification have been denied where the only substantive allegations were nonspecific personal observations and conversations[;] . . . [w]here a plaintiff bases an assertion of a common policy on observations of coworkers or conversations with them, he must provide a minimum level of detail regarding the contents of those conversations or observations").

        Applying these standards, I find that plaintiffs have satisfied the modest showing necessary to warrant conditional certification.  Named plaintiff Infantino has submitted a declaration under penalty of perjury that contains reasonably detailed allegations of defendants' undercounting of hours he worked on construction and demolition projects and underpayment of compensation for the overtime hours he worked.  Specifically, Infantino asserts that he routinely worked between 60 and 98 hours during a workweek but did not receive all the overtime pay to which he was entitled.  (Docket # 20-4 at ¶¶ 4-6).  Defendants' failure to properly compensate him was caused, he claims, by defendants' practice of failing to maintain contemporaneous time records, even though laborers left work at different times, and their practice and policy "of lumping the time worked by its non-managerial laborers . . . in a generalized manner."  (*Id.* at ¶ 7).  Infantino describes particular time-keeping and pay practices on a New York State Thruway I-90 project: as to that project, he recalls that defendants "often" brought a "stack" of non-contemporaneous time records to the job for the laborers to sign; the time records that the laborers were instructed to sign pertained to periods two to four weeks earlier; and, the records were placed on the hood of a truck, and the laborers were instructed to sign them without being

16

given adequate time to verify their accuracy.  His declaration affirms that he worked with as many as forty other laborers on the same jobs and that they performed similar duties.

With respect to plaintiffs' position that Infantino is similarly-situated to other non-managerial laborers, Infantino asserts that the other laborers were subjected to the same time-keeping and pay practices and policies as he was.  Significantly, his declaration states that his knowledge is based upon both his personal observations (as described concerning the I-90 job) and conversations with six coworkers.  In addition to identifying the coworkers by name (Docket # 20-4 at ¶¶ 9(a)-9(f)), Infantino has included allegations relating to the number of conversations he recalls having had with some of them (*id.* at ¶¶ 9(a), 9(b), 9(d), 9(f)), the location of some of the conversations (*id.* at ¶¶ 9(a), 9(c), 9(f)), the particular projects for which they allegedly did not receive proper overtime pay (*id.* at ¶¶ 9(a), 9(b)), the subject matter of their discussions (*id.* at ¶¶ 9(a) ("Mr. Lamont specifically came to me and discussed being short on hours on a particular job"), 9(b) ("I recall [Mr. Lanna] complaining about being shorted on hours . . . he worked during the 104 Flyover job (heading East)"), 9(c) ("Mr. Chicinno was aware that he was shorted on hours"), 9(d) ("I had several conversations with Mr. Williams about his hours worked and compensation being understated [and] [h]e mentioned that this was a constant problem at Sealand"), 9(e) ("Mr. Redding advised me that he . . . was constantly shorted on his pay"), 9(f) ("[d]uring these conversations, Mr. Hart advised me that he too was shorted on his hours and pay")), including, in some cases, particular language used (*id.* at ¶¶ 9(a) ("I recall us talking about how Sealand was literally 'robbing' us of our money"), 9(e) ("Mr. Redding advised me that he would 'eat' hours")), and the reasons two of the coworkers gave him for not leaving Sealand despite being underpaid (*id.* at ¶¶ 9(c), 9(e)).

17

Opt-in plaintiff Hepburn's declaration also affirms that he worked between 50 and 55 hours during his one workweek on the 104 Flyover project but was not paid in full for the overtime he worked.  He also notes that defendants did not maintain contemporaneous time records and "lumped" his time with others' by recording it in a "generalized manner."  (Docket # 20-5 at ¶ 8).  Hepburn states that he too spoke to Jafari Lamont, who told Hepburn that he had been shorted on hours and pay.  (*Id.* at ¶ 9).  According to Hepburn, they spoke during and after the week they worked together on the 104 Flyover project.

Taken together, and considered with the assertions in the complaint, plaintiffs' allegations are sufficiently detailed to meet the modest showing required at this stage of the proceedings to justify conditional certification and notice to putative members of the collective class.  Although defendant Bree disputes the veracity of numerous of plaintiffs' factual assertions, those disputes are merits-based and must await discovery.  They do not warrant denial of plaintiffs' motion at this stage.  *See Shajan v. Barolo, Ltd.*, 2010 WL 2218095, *1 (S.D.N.Y. 2010) ("[w]eighing of the merits [on a motion for conditional certification] is absolutely inappropriate"); *see also Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 354 (E.D.N.Y. 2008) ("[t]he standard in th[e] [Second] [C]ircuit is clear; the merits of plaintiffs' claim are not at issue in a motion for conditional certification").  Accordingly, plaintiffs' application for conditional certification is granted.

In addition to requesting conditional certification of a collective action, plaintiffs request that the Court find that equitable tolling of the statute of limitations is appropriate to permit named and opt-in plaintiffs to assert claims for improperly compensated overtime worked between October 1, 2017 through the date the Court grants conditional certification.  (Docket # 20-1 at 28-31).  Plaintiffs argue that equitable tolling is an appropriate remedy for defendants'

unexpected rescission of their previously-communicated agreement to conditional certification of a collective action consisting of non-managerial laborers who worked for defendants in New York. (*Id.*). As previously noted, defendants have not disputed the veracity of plaintiffs' counsel's representations about defendants' negotiation of and agreement to the stipulation or their subsequent renunciation of it. (*See* Docket ## 31-1, 38). Nor have defendants addressed or specifically opposed plaintiffs' application for equitable tolling. (*Id.*).

"Delays caused by a [d]efendant may warrant equitable tolling, even without any evidence of bad faith." *Kassman v. KPMG LLP*, 2015 WL 5178400, *7 (S.D.N.Y. 2015) ("[t]he delay also was caused by not so extraordinary circumstances outside the opt-in plaintiffs' control – namely [d]efendant's vigorous opposition at every juncture, as well as [d]efendant's resistance to providing information necessary for the class certification motion"); *see, e.g.*, *Yahraes v. Rest. Assocs. Events Corp.*, 2011 WL 844963, *3 (E.D.N.Y. 2011) (granting equitable tolling of FLSA statute of limitations where "plaintiffs have vigorously pursued their claims and, through no fault of their own, have been delayed in prosecuting their action and distributing 216(b) notice to potential opt-in plaintiffs[;] . . . [the court] attribute[s] no trickery or wrongdoing on the part of defendants[;] [it] do[es], however, conclude that defendants will not be prejudiced by any tolling because they have been on notice since the complaint was served . . . that they were potentially liable for 2007 FLSA claims"). *See also Hart*, 2015 WL 365785 at *5-6 (equitable tolling appropriate where delay in determining collective certification motion was substantial and "beyond the control of the parties," potential class members could be prejudiced by delay, and defendants had been aware since commencement of litigation of plaintiffs' assertion of claims going back three years from the filing of the complaint). In view of this authority, the unique facts of defendants' disavowal of their earlier agreement to conditional certification, their lack of

specific opposition to this request (beyond their general opposition to conditional certification), and plaintiffs' diligence in pursuing conditional certification and notice distribution, I find that equitable tolling of the statute of limitations is appropriate, although I find that the tolling period should begin several weeks later than plaintiffs propose.  Specifically, I find that the tolling period should commence on December 4, 2020 – the date that defendants obtained plaintiffs' consent to the first of two extensions to serve their answer, which was conditioned on the tolling of the limitations period.  (*See* Docket ## 7, 10).  By agreement, the period was tolled through December 14, 2020, by which time or shortly after which the parties had begun their negotiations that resulted in the late December conditional certification agreement.

With respect to the notice issue, defendants do not specifically challenge the form or content of plaintiffs' proposed Notice or their proposed method of distribution other than to contest the use of the term "laborers" to define the collective class and the requirement that the consent forms be required to be returned to plaintiffs' counsel rather than to the Court.  Having carefully reviewed the notices proposed (initial, follow-up, and email), I find that they are appropriate and consistent with applicable authority.  So too is plaintiffs' proposal for distribution by first-class mailing, email and posting.  I also grant plaintiffs' request for an order requiring defendants to produce, within fourteen days of this decision, "a computer-readable data file containing the names, last known mailing addresses, all known home and mobile telephone numbers, all known email addresses, and dates of employment for all potential collective action members who worked for [d]efendants in New York" during the relevant period.  As discussed above, however, the relevant period should begin to run on December 4, 2017 (three years prior to December 4, 2020).

With respect to defendants' objection to the use of the term "laborers" to define the collective class, I disagree that it is too vague or broad to be reasonably understood. The Notice makes clear that putative class members are receiving notice because they may have worked as a "manual laborer" for defendants during the relevant period. Because Sealand's business was construction and demolition work, the term laborer makes sense and is unlikely to give rise to confusion. Moreover, its use has been approved by many courts in FLSA actions involving construction work. *See, e.g., Sanchez v. Art+1, Inc.*, 2021 WL 871416, *3-4 (S.D.N.Y. 2021) (conditionally certifying collective class composed of "all current and former construction laborers employed by [d]efendants"); *Portilla v. Bridgehampton Stone, Inc.*, 2019 WL 1128364, *2 (E.D.N.Y. 2019) (conditionally certifying collective class consisting of "current and former employees of [d]efendants who, as of July 26, 2016, performed any work for [d]efendants as non-managerial construction laborers"); *Dieffenbauch v. Rhinehart R.R. Constr., Inc.*, 2018 WL 4150883, *6 (N.D.N.Y. 2018) (in railroad construction and maintenance context, conditionally certifying collective composed of "[a]ll persons employed by [defendant] as 'Railroad Workers' ('Operators/Laborers')"); *Valerio v. RNC Indus., LLC*, 314 F.R.D. 61, 73 (E.D.N.Y. 2016) (conditionally certifying collective composed of "[a]ll current and former laborers (carpenters, welders, mechanics, etc.) employed by [defendants]"); *Morris v. Lettire Constr., Corp.*, 896 F. Supp. 2d 265, 273 (S.D.N.Y. 2012) (conditionally certifying collective consisting of "all foremen and laborers who worked for defendants"). As for defendants' second objection – the provision permitting consents to be returned to plaintiffs' counsel – ample law supports plaintiffs' proposal, especially because the Notice clearly advises putative collective members that they have the right to retain other counsel or represent themselves. *See Gui Zhen Zhu v. Matsu Corp.*, 424 F. Supp. 3d 253, 271 (D. Conn. 2020) ("[w]here the proposed notice or

21

consent form expressly informs putative plaintiffs of their right to retain separate counsel, the courts are more inclined to permit putative plaintiffs to return their consent to the named plaintiff's counsel") (quotations omitted); *see also Robbins v. Blazin Wings, Inc.*, 2016 WL 1068201 at *7-8 (approving consent form directing consents to be returned to counsel) (citing No. 15-CV-6340, ECF No. 29-1 at 62-63); *Hart*, 2015 WL 365785 at *5 (same).  Accordingly, plaintiffs' request for approval of the proposed Notice and method of distribution and dissemination is granted, except that the temporal scope of the opt-in claims shall be limited to those arising on or after December 4, 2017.

## II.   Defendants' Cross-Motion to Compel Arbitration

### A.      The Parties' Positions and the Collective Bargaining Agreements

Defendants cross-move for an order compelling Infantino to submit to arbitration of his wage claims pursuant to the terms of his union's collective bargaining agreements in force during the period between 2017 and 2021 (the "CBAs").  (Docket # 33-1 at 11-13, 20). Specifically, defendants maintain that Infantino, a member of Local 435 Laborers International Union of North America Affiliated with the AFL-CIO at all relevant times (*see id.* at 7-8; Docket ## 33-2 at ¶ 9; 33-5), was required to pursue his claims for overtime compensation through a mandatory grievance and arbitration procedure set forth in Article XX of the CBAs.  (Docket # 33-1 at 7-13). Because he did not do so, defendants continue, he may not seek relief in federal court.  (Docket # 38 at 9).

In support of their motion, defendants have submitted copies of the two CBAs applicable during the relevant time period, which are identical in all respects material to the

motion.  (*See* Docket # 33-5).  Article XX, entitled "Arbitration" and which sets forth the

provisions upon which defendants rely, provides in relevant part as follows:

> 2. Grievance Procedure: All grievances or disputes involving any controversy, dispute or misunderstanding arising as to the meaning, application or observance of any provisions of the Agreement shall be handled in the manner hereinafter set forth.  It is agreed that all matters pertaining to the interpretation of the Agreement must be referred directly to the Joint Committee, provided that if a grievance has not been filed, the matter shall not be a subject of arbitration until a grievance is filed.

> Step 1.  All grievances must be made known in writing to the other party within seven (7) calendar days after the reason for such grievance has occurred.  The aggrieved employee's or employees' shop steward or another authorized representative of the Union shall first submit a written grievance to the Job Superintendent, or his duly authorized representative.  The Shop Steward or another authorized representative of the Union of the Employee or the Employees involved shall be present at any meeting between the Job Superintendent and such employee or employees.  The Job Superintendent or his duly authorized representative must make a written disposition of the matter within twenty-four (24) hours after the submission of such written grievance thereto.

> Step 2.  If the disposition of the matter by the Job Superintendent or his duly authorized representative is not satisfactory, the matter must be taken up by the Business Agent, and representative of the Employer with authority to act within forty-eight (48) hours of the written disposition set forth in Step 1.

> Step 3.  If the disposition of the matter in Step 2 is not satisfactory, either party has a right to file its grievances with the Joint Committee referred to in Section 2 of this Article within seventy-two (72) hours after Step 2.

> 3. The Unions, Association and Employer who are signatories to this shall together establish for the duration of the Agreement, a Joint Committee.  The Joint Committee shall consist of three (3) representatives of the Employers and three (3) representatives of the Union.  All meetings of the Joint Committee must be attended by each member or his alternate, but the absence of any member or alternate shall not invalidate the action of the members of the Joint Committee who are present.

It shall be the function of the Joint Committee to settle disputes and grievances which cannot be settled in accordance with Steps 1, 2 and 3 of the grievance procedure.  The Joint Committee shall formulate rules of procedure to govern the conduct of its proceedings including the time, date and place of meetings.

A decision by a majority of the Joint Committee shall be final and binding on the parties and employees involved.  Failure of either party involved to comply with any final decision of or to submit to the jurisdiction of the Joint Committee shall give the other party the immediate right to all legal and economic recourse.

4. Rights of the Joint Committee: The Joint Committee shall have the right to investigate all facts pertaining to the dispute.  The Joint Committee shall, upon each dispute or grievance processed in accordance with this Article after completion of or as a part of Step 2, have the right to examine time sheets and any other records pertaining to the computation of compensation of any individual or individuals whose pay is in dispute.  Both parties shall be entitled to present such evidence and witnesses in support of their position as they see fit.

5. Arbitration: If a grievance cannot be satisfactorily settled by a majority decision of the Joint Committee, the grievant shall request a list of seven (7) arbitrators from (1) the panel arbitrators of the New York Board of Mediation; (2) the Federal Mediation and Conciliation Service, or (3) the labor panel of the American Arbitration Association for final and binding decision.  Such request shall be no later than fifteen (15) calendar days, from the date of the oral announcement of the Joint Committee's decision, by the grievant or his duly assigned representative.  Further any arbitration agency named shall be used only for every third arbitration that may arise between the parties to the end that arbitrators be selected on a rotating basis in the order in which the agencies are hereinabove listed.  The arbitrator shall be selected by alternately eliminating names from the seven (7) person list until one remains, the grievant or his representative shall strike the first name.

Upon failure to comply with the provisions of this entire section on the part of the grievant, the grievance shall be deemed to have been closed without decision.  The arbitrator shall not have jurisdiction or authority to add to, modify, detract from, or alter in any way the provisions of this Agreement or any amendment or supplement thereto or to add new provisions of the Agreement or any amendment or supplement thereto.  If the arbitrator should determine that the grievance is not covered by the Agreement, he

24

shall return the grievance to the parties without decision and the grievance shall be closed.  In such case, the costs, if any, shall be borne by the grievant.

6. **Violations concerning wages, hours, and all fringe benefit payments shall not be subject to the grievance procedure**.  In such cases, the Union shall give three (3) working days' notice to the Employer that the Union will withdraw its men from the Employer's service.  If the Employer contends there is a question of fact regarding the alleged violation, he may file a grievance within the aforesaid three (3) working days with a copy to the Local Union and a copy of the Co-Secretaries of the Committee.  When a grievance has been filed, there shall be no work stoppage pending resolution of the grievance pursuant to Article XX(2)(3) and subsequent provisions of this Article.  Work jurisdiction, that is, disputes with respect to whether one group of employees or another group of employees, shall perform certain work on the project is expressly not arbitrable under this contract.

(Docket # 33-5 at 34-38 (2013-2018 CBA), 88-92 (2018-2021 CBA) (emphasis supplied)).

Plaintiffs oppose defendants' motion on the grounds that their wage violation claims are expressly excluded from mandatory arbitration pursuant to the plain language of Section 6 of Article XX.  (Docket # 37 at 20-23).  To find otherwise, they reason, would render Section 6 superfluous.  (*Id.* at 22).

In reply, defendants pivot slightly from the argument advanced in their initial brief.  Despite not including the language of Section 6 among the provisions quoted in their opening brief, they argue in their reply memorandum that Section 6 by its terms in fact requires employees like Infantino to submit any wage violation claim to a mandatory process culminating in arbitration.  (Docket # 38 at 8 ("[t]he remainder of [Section 6] sets forth a mandatory procedure for the parties to follow in the case of an alleged wage violation, which includes a pathway for the matter to be subject to the grievance and arbitration procedure")).  Defendants contend that even if plaintiffs' claims could be construed as "violations concerning wages" within the scope of Section 6, Infantino would have been required to notify his union so that the

25

union could provide notice of its intent to withdraw, which would have allowed Sealand to contest the alleged violation by filing a grievance.  Thus, in defendants' view, whether Infantino's overtime claims are subject to the grievance procedure of Section 2 or the implied mandatory notice procedure of Section 6, "it always ended with Sealand's ability to have such claim arbitrated."  (*Id.* at 9).

### B.   Analysis

The Second Circuit has repeatedly affirmed the "familiar principle that the Federal Arbitration Act ("FAA") embodies a national policy favoring arbitration."  *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 179 (2d Cir. 2021) (alterations and quotation omitted) (citing *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 228 (2d Cir. 2016)); *accord Daly v. Citigroup, Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) ("[i]n accordance with the strong federal policy favoring arbitration as an alternative means of dispute resolution, we resolve any doubts concerning the scope of arbitrable issues in favor of arbitration") (quotation omitted), *cert. denied*, 140 S. Ct. 1117 (2020); *see also AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) ("there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute") (alterations and quotations omitted).  Still, "the law is undisputed that 'a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*.'"  *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d at 179 (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010)); *accord Nicosia v. Amazon.com, Inc.*, 834 F.3d at 229 ("the FAA does not require parties to arbitrate when they have not agreed to do so") (quotations omitted).  "Courts consider two factors when deciding if a

dispute is arbitrable: '(1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue.'"  *Cooper*, 990 F.3d at 179 (quoting *Holick v. Cellular Sales of New York, LLC*, 802 F.3d 391, 394 (2d Cir. 2015)).

"In answering the first question – whether the parties agreed to arbitrate – we look to state contract law principles."  *Abdullayeva v. Attending Homecare Servs. LLC*, 928 F.3d 218, 222 (2d Cir. 2019).  As to the second question, the Second Circuit has acknowledged three guiding principles: (1) doubts should be resolved in favor of arbitration; (2) a union may agree, on behalf of its members, to arbitration, "even one that mandates arbitration of FLSA claims"; and, (3) "such waivers of union members' right to bring claims in court must be clear and unmistakable."  *Id.* (citing *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1626-27 (2018)).

In determining whether the parties have agreed to arbitrate the claims at issue in this litigation, I begin with the plain language of Section 6 of the CBAs, which provides that "[v]iolations concerning wages [and] hours . . . shall not be subject to the grievance procedure." (Docket # 33-5 at 37, 92).  The reasonable construction of this clear language is to exclude from the mandatory grievance process outlined in Article XX those claims, like those at issue in this case, that arise from alleged violations of federal and state wage and hour laws.  Defendants offer a different construction.

First, they assert that the claims at issue in this case are not encompassed by the term wage "violations" in Section 6.  (Docket # 33-1 at 9).  Specifically, they argue that:

> there was no violation[] because [p]laintiff was paid what his timesheets reflected he was owed – time sheets that [p]laintiff certified were accurate.

(*Id.*).  In other words, they view Section 6 as inapplicable to claims for compensation exceeding that reflected in an employee's time sheets.  Their construction is at odds with the FLSA itself,

which does not foreclose claims based upon allegations of hours worked beyond those reflected on a timesheet, even where the timesheets were signed by an employee.  *See, e.g.*, *Lawtone-Bowles v. City of New York*, 2020 WL 2833366, *4 (S.D.N.Y. 2020) ("[d]efendant's principal argument in favor of its summary judgment motion is that [p]laintiffs failed to report the unpaid overtime, and in fact certified that the timesheets they submitted were accurate . . . [;] [defendant] has made this argument repeatedly in FLSA overtime litigation in this [d]istrict and it has been unanimously rejected[;] . . . [d]efendant's argument would seem to violate one of the bedrock principles of FLSA overtime law in th[e] [Second] Circuit: that an employer's duty under the FLSA to maintain accurate records of its employees' hours is non-delegable") (citations and quotations omitted); *accord Caserta v. Home Lines Agency, Inc.*, 273 F.2d 943, 945-46 (2d Cir. 1959) (Friendly, J.) (employee not precluded from asserting an overtime claim under the FLSA even though he "ke[pt] time sheets showing the hours that he worked"; "[t]he obligation [to pay overtime] is the employer's and it is absolute[;] [h]e cannot discharge it by attempting to transfer his statutory burdens of accurate record keeping . . . and of appropriate payment, to the employee").  In other words, defendants ask the Court to determine that Infantino's claims do not involve wage and hour "violations" on the basis of an assumed set of facts that has not been tested through discovery and that, even if credited, does not amount to a legal defense to the claims.[4]  Defendants' construction would deprive every employee of the right to pursue his or her legal claims in federal court in favor of mandatory grievance and arbitration where an employer merely asserts that they have evidence with which to contest that a violation occurred.  Defendants' interpretation of Section 6 simply makes no sense.

---

[4]  Moreover, defendants themselves admit that Infantino did not sign all of his timesheets.  (*See* Docket # 33-2 at ¶ 14 ("80% of Mr. Infantino's hours . . . were certified by him")).

Second, defendants claim that even if Infantino's claims could be considered wage and hour violations within the meaning of Section 6, they still are subject to required submission to the Joint Committee referenced in Article XX and, if not satisfactorily resolved there, to binding arbitration.  They reach this conclusion by construing Section 6's reference to "the grievance procedure" as limited to the steps enumerated in Section 2, the paragraph entitled "Grievance Procedure."  Specifically, they contend that wage and hour violations within the ambit of Section 6 do not need to be grieved to the Job Superintendent at Step 1 nor to the Business Agent at Step 2.  At oral argument, they clarified that their position is that Infantino was still required to submit his claims to the Joint Committee – a step that they characterized as Step 4 – and, if not satisfactorily resolved there, to binding arbitration – a final step that they characterized as Step 5.  The terms "Step 4" and "Step 5" are nowhere contained in Article XX.

As an initial matter, defendants' contention that Section 6 excludes wage violations only from Steps 1 and 2 of the grievance procedure spelled out in Section 2 but still requires Infantino to submit his claims to the Joint Committee is contradicted by the language of Section 2.  Section 2 provides that either party dissatisfied with the Step 2 disposition has the right to submit the grievance to the Joint Committee for attempted settlement.  Section 2 explicitly refers to that phase as "Step 3" of the grievance procedure.  Defendants cannot avoid the force of their own admission that Section 6 excludes wage violations from the Section 2 grievance procedure by ignoring the plain language of Section 2 that defines "Step 3" as the submission of the grievance to the Joint Committee.  Step 3 is part of the three-step grievance procedure delineated in Section 2.  Section 6's exclusion of wage violations from the grievance procedure should be read to include all enumerated steps, including Step 3 submission to the Joint Committee.

29

Insofar as defendants suggest that the Joint Committee has independent jurisdiction to consider disputes that are not subject to the grievance steps enumerated in Section 2, that suggestion appears refuted by the plain language of Section 3: "It shall be the function of the Joint Committee to settle disputes and grievances which cannot be settled in accordance with Steps 1, 2 and 3 of the grievance procedure."  (Docket # 33-5 at 36, 90).  Nor does Section 4, entitled "Rights of the Joint Committee," counsel a different conclusion.  While the first sentence of that section recognizes the Joint Committee's "right to investigate all facts pertaining to the dispute," the second sentence makes clear that "the dispute" refers to "each dispute or grievance processed in accordance with this Article after completion of or as a part of Step 2."  (*See id.*).  Both Sections 3 and 4 confirm that the Joint Committee serves as a Step 3 phase to review and settle grievances that cannot be resolved at Steps 1 and 2.[5]

Likewise, Section 5 of Article XX outlines the final stage of the progressive grievance procedure.  It provides for required and binding arbitration of any "grievance []not . . . satisfactorily settled by a majority decision of the Joint Committee."  (*See id.* at 36-37, 91).  Its terms do not purport to require arbitration of disputes of matters not subject to the grievance process.

Notwithstanding the absence of clear language requiring arbitration of wage violation claims otherwise excluded from the grievance process, defendants suggest that the requirement should be inferred from the reference in Section 4 to the Joint Committee's "right to examine time sheets and any other records pertaining to the computation of compensation of any

---

[5]  The only exception to the Joint Committee's lack of jurisdiction to entertain disputes that have not been grieved through Steps 1 and 2 is its right to consider "matters pertaining to the interpretation of the [CBA]," which Section 2 provides "must be referred directly to the Joint Committee."  (Docket # 33-5 at 34-35, 89).  Neither side refers to or relies on this provision.  Significantly, the provision bars arbitration of such disputes "if a grievance has not been filed."  (*Id.*).  Because defendants cannot demonstrate that any grievance has been filed relating to Infantino's claims, they may not rely on this section in support of their request for an order compelling arbitration.

individual or individuals whose pay is in dispute." (Docket ## 33-1 at 9, 13; 38 at 8; *see* Docket # 33-5 at 36, 90-91). Article XX and its constituent provisions are hardly a model of clarity. That said, the Court declines to interpret Article XX on the basis of language in Section 4 dealing with the Joint Committee's investigative and examination rights as *mandating* grievance and arbitration of wage violation claims. Such construction would contradict the express provision of Section 6 excluding such claims from the mandatory grievance procedure and would read into Section 5, the provision governing arbitration of grievances, a requirement that does not exist.[6]

In sum, because I construe Infantino's claims as alleged wage and hour violations, I find that they are governed by Section 6. The plain language of the first sentence of Section 6 excludes them from the required grievance procedure outlined in Article XX applicable to other disputes. For the reasons explained above, I also reject defendants' contention that the grievance procedure from which Infantino's claims are excluded pursuant to Section 6 should be interpreted to encompass only Steps 1 and 2 and not Step 3 submission to the Joint Committee. Finally, I disagree with any suggestion by defendants that wage violations excluded from the mandatory progressive grievance procedure are nonetheless subject to mandatory arbitration. No provision of Article XX imposes such a requirement.

As a final matter, I considered, and asked the parties to provide supplemental briefs concerning, the line of authority recognizing the applicability of the "clear and unmistakable" standard to questions of waivers of statutory rights in collective bargaining agreements.

---

[6] Nor will the Court read into Section 6 a requirement that an employee notify the union of claimed wage violations, as defendants urge. (Docket ## 33-1 at 9-10; 38 at 9). Although Section 6 affords the union the right to withdraw its members from a job where wage violations are claimed to be occurring provided that the union affords the employer three working days' notice, it does not state that an employee must notify the union of such claimed violations.

> A collective bargaining agreement cannot preclude a lawsuit based on individual statutory rights unless the arbitration clause in the agreement is 'clear and unmistakable.' *See Wright v. Universal Maritime Servs. Corp.*, 525 U.S. 70, 79-80 (1998) . . . .  A 'clear and unmistakable' waiver exists where one of two requirements is met: (1) if the arbitration clause contains an explicit provision whereby an employee specifically agrees to submit all causes of action arising out of his employment to arbitration; or (2) where the arbitration clause specifically references or incorporates a statute into the agreement to arbitrate disputes.[7]

*Quintanilla v. Suffolk Paving Corp.*, 2011 WL 1323033, *3 (E.D.N.Y.) (collecting cases), *report and recommendation adopted by*, 2011 WL 1253248 (E.D.N.Y. 2011).  Courts applying this authority have denied or recommended denial of motions to dismiss and compel arbitration of wage violation claims brought under the FLSA and the NYLL where the collective bargaining agreement, like the CBAs at issue here, did not explicitly reference either statute but contained a provision, like the first sentence of Section 2 of the CBAs here, requiring arbitration of any disputes concerning the interpretation, application or claimed violation of a specific term or provision of the collective bargaining agreement.  *See*, *e.g.*, *Nikolaeva v. Home Attendant Servs. of Hyde Park*, 2018 WL 6984837, *5 (E.D.N.Y. 2018) (citing *Tran v. Tran*, 54 F.3d 115, 118 (2d Cir. 1995)) (recommending setting aside default judgment; finding "it is unlikely that [p]laintiff was subject to a mandatory arbitration clause during her employment with [d]efendants that would preclude this lawsuit"), *report and recommendation adopted by*, 2019 WL 147721 (E.D.N.Y. 2019); *Quintanilla v. Suffolk Paving Corp.*, 2011 WL 1323033 at *3-5; *Alderman v.*

---

[7]  In defendants' supplemental memorandum, they argue for the first time that plaintiffs' claims are preempted by Section 301 of the Labor Management Relations Act.  (Docket # 43 at 4-7).  That argument is not properly before the Court, and I have not considered it in connection with the pending motions.  *See*, *e.g.*, *Grande v. Hartford Bd. of Educ.*, 2021 WL 231134, *11 n.10 (D. Conn. 2021) ("[t]he [c]ourt declines to consider arguments that were not advanced in the [p]laintiff's opposition to the motion for summary judgment or at oral argument and which were outside the scope of the supplemental briefing ordered by the [c]ourt"); *see also Sharp v. Ally Fin., Inc.*, 328 F. Supp. 3d 81, 105 (W.D.N.Y. 2018) ("[i]t is well-established in th[e] [Second] Circuit that new arguments raised in successive briefing papers will not be considered where those arguments could have been raised in a previous submission") (collecting cases).  Because the argument is not properly before the Court, I agree with plaintiffs that it should be stricken.  (*See* Docket # 44).

*21 Club Inc.*, 733 F. Supp. 2d 461, 469-70 (S.D.N.Y. 2010) (citing *Rogers v. New York Univ.*, 220 F.3d 73, 76 (2d Cir. 2000)).  Those provisions, the courts have reasoned, are not sufficiently clear and unmistakable to constitute an enforceable waiver of an employee's right to pursue FLSA claims in federal court.  *See*, *e.g.*, *Nikolaeva v. Home Attendant Servs. of Hyde Park*, 2018 WL 6984837 at *5; *Quintanilla*, 2011 WL 1323033 at *4; *Alderman v. 21 Club Inc.*, 733 F. Supp. 2d at 470 ("[t]he provisions in the CBA do not expressly specify that all disputes, including those arising under federal law, are subject to arbitration[;] [m]oreover, the CBA does not name or incorporate the FLSA into the arbitration clause[;] [a]s such, the provisions of the CBA are too broad and general to demonstrate the requisite 'clear and unmistakable' intent to submit all federal statutory claims to arbitration").  *See also Abdullayeva v. Attending Homecare Servs. LLC*, 928 F.3d at 223 (the "clear and unmistakable" standard "ensures that employees' right to bring statutory [FLSA and NYLL] claims in court is not waived by operation of confusing, very general arbitration clauses") (internal quotation omitted).

   This authority would appear to stand for the proposition that Infantino could not be compelled to arbitrate his wage claims pursuant to the provisions of Article XX, even without resort to Section 6.  That is because the specific arbitration clause in the first sentence of Section 2 is similar, if not identical, to the clauses found by courts to violate the "clear and unmistakable" standard.  In this case, however, the CBAs explicitly provide in Section 6 that wage violations are excluded from the mandatory grievance procedure culminating in arbitration, thus obviating the need to interpret the general arbitration clause.

   Accordingly, I recommend that defendants' motion to compel arbitration be denied.

III.     **Defendants' Cross-Motion in the Alternative to Dismiss the Complaint**

   A.     **The Parties' Contentions**

Pursuant to Fed. R. Civ. P. 12(b)(6), defendants move, in the alternative, to dismiss Infantino's complaint in its entirety for failure to exhaust administrative remedies under NYLL § 220 – the New York State statute that governs compensation for "prevailing wage jobs."[8]  (Docket # 33-1 at 13-15).  The factual predicate for defendants' motion is their assertion in their memorandum of law, unsupported by any citation to the pleadings, that Infantino "worked on [p]revailing [w]age [j]obs."  (*Id.* at 13).  In support of their motion, defendants offer Bree's declaration, which includes the following allegation: "[f]rom October 1, 2017 through present, Sealand worked on contracts considered public projects that were funded by federal, state, village, city or county governments or school districts . . . [for which] [t]he payment of correct wages, including overtime, and benefits . . . is subject to enforcement by the New York State Department of Labor".  (Docket # 33-2 at ¶¶ 4, 6).  Defendants maintain that because prevailing wage claims are subject to the administrative exhaustion requirements of NYLL § 220, plaintiffs' failure to have pursued those procedures mandates dismissal of the complaint. (Docket # 33-1 at 15).

Plaintiffs dispute that their claims are subject to administrative exhaustion requirements; they represent that the complaint includes no prevailing wage claims under NYLL § 220 but rather asserts claims based on their "regular rate of pay" brought under provisions of the NYLL that do not require exhaustion.  (Docket # 37 at 9, 23-24) (Infantino "bases his claims,

---

[8]  Because defendants filed their purported Rule 12(b)(6) motion after their answer, it is untimely (*see* Fed. R. Civ. P. 12(b)), but nonetheless should be construed as a motion for judgment on the pleadings pursuant to Rule 12(c).  *See, e.g., Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001); *Violet Realty, Inc. v. Affiliated FM Ins. Co.*, 267 F. Supp. 3d 384, 386 n.1 (W.D.N.Y. 2017).  The standard applicable to Rule 12(c) motions is identical to that applicable to Rule 12(b)(6) motions.  *See, e.g., Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010); *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d at 126.

as well as the claims he brings on behalf of the putative collective and class, on his allegations that [d]efendants failed to pay him one and one-half his regular rate of pay for his hours worked over forty, *not the prevailing wage rate*").  In reply, defendants' argue that "[i]n order to maintain the effectiveness of the exhaustion requirement of NYLL § 220, this Court should hold that [p]laintiff cannot circumvent that requirement by saying that his claim arises under a different statute" when it is, in actuality, a claim arising under NYLL § 220.  (Docket # 38 at 9-10).

### B.   <u>Analysis</u>

"Depending upon the nature of a plaintiff's claim under the NYLL, he or she may not be required to exhaust administrative remedies before bringing suit for unpaid wages." *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 358 (E.D.N.Y. 2015).  Claims brought pursuant to Article 6 of the NYLL, relating to "Payment of Wages" (*see* NYLL § 190, *et seq.*), do not require exhaustion, nor do claims brought for unpaid wages and overtime pursuant to Article 19, New York's Minimum Wage Act (*see* NYLL § 650, *et seq.*).  *See id.*  "However, Article 8 of the NYLL, which applies to public works projects, requires an employee to exhaust administrative remedies before bringing a private right of action."  *Id.* at 358-59 (citing NYLL § 220(8)).  The overtime wage requirements of both the FLSA and 12 NYCRR § 142-2.2 (cited in paragraph 1 of plaintiffs' complaint) are based upon an employee's "regular rate" of pay.  *See also Brown v. Tomcat Elec. Sec., Inc.*, 2007 WL 2461823, *2 (E.D.N.Y. 2007).[9]

---

[9]  Although the New York State Labor Law does not include specific provisions governing overtime compensation, New York has codified its overtime requirement in 12 NYCRR § 142-2.2.  *See Ballard v. Cmty. Home Care Referral Serv., Inc.*, 264 A.D.2d 747, 747-78 (2d Dep't 1999); *see also Robles v. Copstat Sec., Inc.*, 2009 WL 1867948, *2 (S.D.N.Y. 2009) ("[a]lthough there are no explicit provisions governing overtime compensation under the New York Minimum Wage Act, New York state courts have recognized a cause of action for unpaid overtime wages against corporations pursuant to [12 NYCRR § 142-2.2]").

As plaintiffs point out, the complaint does not explicitly reference "prevailing wage rates" or assert claims under NYLL § 220, the prevailing wage statute; rather, Infantino pleads his NYLL overtime claim pursuant to NYLL § 160 and 12 NYCRR § 142-2.2.  (*See* Docket # 1 at ¶¶ 49-54).  Defendants counter that regardless of the manner in which plaintiffs frame their claims or the statutes cited, plaintiffs' claims should be construed as prevailing wage claims because the work conducted by Infantino was on public work projects subject to prevailing wage requirements.  In my view, defendants' position fails for the simple reason that, as a matter of fact, the pleadings do not establish that Infantino worked on prevailing wage jobs, let alone that he worked *exclusively* on prevailing wage jobs.

Although Bree's declaration asserts that Sealand worked on public works construction projects, the declaration is not a pleading, and defendants' motion to dismiss must be assessed on the four corners of the pleadings.  *See*, *e.g.*, *Regan v. Vill. of Pelham*, 2021 WL 1063320, *8 n.6 (S.D.N.Y. 2021) ("[p]laintiff's reliance on [defendant's policy], which appears nowhere in the [a]mended [c]omplaint and is only discussed in [p]laintiff's affidavit, is improper because it is beyond the four corners of the complaint and cannot be considered in adjudication of a Rule 12(b)(6) motion to dismiss for failure to state a claim"); *Bryant v. Ciminelli*, 267 F. Supp. 3d 467, 472-73 (W.D.N.Y. 2017) ("[i]n deciding a Rule 12(b)(6) motion, the [c]ourt is generally limited to reviewing the allegations contained within the four corners of [p]laintiff's complaint[;] . . . [i]f the [c]ourt considered any of the additional facts or affidavits, the motion would be converted to one for summary judgment[;] [n]o party is on notice of such a conversion, and as [p]laintiff's counsel points out, no discovery has yet occurred in this case[;] . . . [t]herefore, such conversion is inappropriate, and the [c]ourt will not consider the extraneous material provided by the parties in deciding the instant motion") (alterations and quotations

omitted).  Moreover, defendants' memorandum of law states that "most of" Sealand's work was

prevailing wage job work, meaning, of course, that some was not, and that 80% of Infantino's

work was on prevailing wage projects.  (*See* Docket # 33-1 at 5 ("[p]ublic projects in New York

are governed by the Prevailing Wage, so most of Sealand's work involves multiple layers of

wage oversight relating to the certified payment of overtime wages including union(s), New

York State Department of Labor and job owners"), 7 ("[w]hile [p]laintiff worked for Sealand,

Sealand had multiple ongoing projects, including . . . [p]revailing [w]age [j]obs"), 10 ("[f]or 80%

of [Infantino's] employment at Sealand, [he] worked on [p]revailing [w]age [j]obs").  Which

particular projects worked on by Infantino and other plaintiffs were prevailing wage jobs may be

an issue for discovery.  At this junction, however, dismissal of the complaint on the grounds that

Infantino's claims could relate only to prevailing wage jobs is inappropriate because it is based

upon an unsupported construction of the pleadings.

       Assuming, as I do, that the complaint cannot reasonably be read to assert NYLL

§ 220 claims or to include allegations that Infantino seeks overtime compensation based upon

prevailing wage rates,[10] defendants appear to urge the Court to dismiss the complaint on the

grounds that Infantino's pleadings do not disprove that his asserted regular-rate overtime claims

in fact relate to work done on public projects subject to prevailing wage requirements.  Stated

another way, defendants appear to suggest that his pending claims – that defendants do not

otherwise suggest are facially inadequate – should be dismissed because Infantino has not shown

that they could not have been brought under Section 220 and, if they could have, that he met the

exhaustion requirements of that statute.  The cases upon which defendants principally rely for

this position are materially different from this case because they (1) involved complaints that

---

[10] Indeed, the absence in defendants' answer of a defense based upon failure to exhaust administrative remedies suggests that defendants also did not read the complaint to include such a claim.  (*See* Docket # 11).

included Section 220 claims or allegations that plaintiffs were seeking unpaid wages, including

prevailing wages and (2) addressed summary judgments motions.  *See Almazo v. M.A.*

*Angeliades, Inc.*, 2016 WL 5719748, *4 (S.D.N.Y. 2016); *Brandy v. Canea Mare Contracting,*

*Inc.*, 825 N.Y.S.2d 230 (2d Dep't 2006).  *See also Maddison v. Comfort Sys. USA (Syracuse),*

*Inc.*, 2020 WL 2560964, *5 n.3 (N.D.N.Y. 2020) ("the plaintiffs in *Brandy* sought compensation

at the prevailing wage rate").  The case at bar is far more similar to the recently-decided case

*Maddison v. Comfort Systems USA (Syracuse), Inc.*, 2020 WL 2560964 (N.D.N.Y. 2020), in

which the plaintiffs, like plaintiffs here, "d[id] not ask the [c]ourt to apply a prevailing wage rate

to any of their work hours."  *Maddison*, 2020 WL 2560964 at *5.  The absence of any such

allegations led the court in *Maddison* to determine that dismissal was not appropriate at the

pre-discovery pleadings stage.  *Id.* (citing *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d at

358-61 and n.2).  I likewise find that dismissal is not appropriate at this early stage of the

proceedings, particularly because defendants' opposition papers themselves indicate that Sealand

and Infantino performed both prevailing wage and non-prevailing wage work.

Accordingly, I recommend that defendants' motion to dismiss plaintiffs'

complaint in its entirety be denied.


## CONCLUSION

For the reasons stated above, the Court **GRANTS** plaintiffs' motion for

conditional certification and approval of and authorization to distribute the proposed notice to the

collective class **(Docket # 20)**.  The Court also **GRANTS** plaintiffs' motion to strike portions of

defendants' supplemental memorandum of law **(Docket # 44)**.  This Court recommends that the

district court toll the statute of limitations as specified herein **(Docket # 20)** and deny

defendants' motion to compel arbitration or, in the alternative, dismiss the complaint **(Docket # 33)**.

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      May 11, 2021

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b), 6(a) and 6(e) and Local Rule 72.

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) of the Local Rules for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72(b), or with the similar provisions of Rule 72(a) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**IT IS SO ORDERED.**

                                                              *s/Marian W. Payson*
                                                        MARIAN W. PAYSON
                                                     United States Magistrate Judge

Dated: Rochester, New York
          May 11, 2021